Judge Cabell.
This is a bill filed by Jett, to injoin proceedings on a delivery bond, executed by him, as surety for General Henry Lee to Hunter’s administrators. There are various matters in the bill, to which it will not be necessary to advert; as it is admitted that the only proper subjects ef controversy now remaining to the parties, are those which grow out of the arrangement made between Lee and Hunter’s administrators, subsequently to the delivery bond.
The bill states, that immediately after the service of the execution, and the proceedings thereon, Lee waited upon Henry St. George Tucker, the agent of Hunter’s administrators, and obtained a letter from him to their attorney, stating that as the agent of Hunter’s administrators, he had made an arrangement which would suspend for the present, all proceedings on the judgment and delivery *105 bond; and directing him to proceed no farther, until farther ad vised; which would probably not be the case. A copy of the letter is exhibited, bearing date the 29th of March, 1806. The bill then goes on to state the arrangement allowed to in the letter, viz; “ that a certain P. R. Beverley urdertook to settle the debt of Lee, provided Hunter’s administrators would receive bonds to the amount:” that the complainant had seen a copy of an account between Beverley and Lee, in which the former charged the latter with 2500Í. paid to Hunter’s administrators, on account of this debt, and credited him with 1600Í, received on the .same account; and that he has been informed that Hunter’s administrators acknowledge to have received 1600Í. from Beverley. He complains that Hunter’s administrators have procured an award of execution on the delivery bond, overlooking the arrangement between Tucker, Lee and Beverley. He calls on them to state, what were the arrangements alluded to in the letter aforesaid; whether it Was not agreed that P. R. Beverley should pay the debt aforesaid, or how much thereof, and how much he did pay; whether any and what securities, either in lands or bonds or otherwise,- had been received from Lee, or from others for him; and that such securities shall be delivered up to the complainant for his indemnification; and that the money due thereon may be decreed to be paid to him: that the administrators of Hunter may be injoined from proceeding on the said execution; and concludes with a prayer for general relief.
The answer of Tucker refers to the arrangement aforesaid, and exhibits a copy thereof. It appears from the arrangement, as I understand it, that Tucker- did propose to receive from Lee, good Augusta bonds, taken to P. R. Beverley, to the full amount of General Lee’s debt; or, if such bonds could not then be procured, that he would receive P. R. Beverley’s note to deliver such bonds to the full amount of the debt, by some certain day. These bonds were to be payable in one, two, three and four years. *106 They were to be received on the part of the administrators, as a collateral security only, and not as a discharge of the judgment theretofore obtained by the administrators against General Lee, or as a payment of the delivery bond; and it is declared to be distinctly understood, that the transaction is not to operate as a release of the debt due from Lee, or as altering its nature in any wise; and that the administrators agree, on their part, in consideration of a punctual compliance by General Lee, in delivering the bonds, &c. not to proceed on the judgment at law, and forthcoming bond, until there should be a failure in the payment of the Augusta bonds to be delivered. Tucker's answer farther stales, that Lee did not fully comply with bis engagement for the delivery of the bonds: that he only gave Beverley's note for the delivery of bonds to the amount of 2500/. which was between $500 and $1000 less than the note should have been for: that Beverley did not fully comply even with that note, as he delivered bonds to the amount of 1694/. 10 8; and that a small part of them had been lost by insolvencies. He, however, expresses a willingness that a credit may be given, for the present, for 1694/. 10 8, with interest at the rate of 5 per cent, per annum, from March 29th, 1806, on 798/. 8, and with like interest from March 31st, 1807, on 896/. 2 8. He insists, however, on a reference to a commissioner, for the purpose of ascertaining more accurately, what should be the final decree; believing that he has allowed more interest than is proper, and reserving the right to correct the amount of principal also, for which he had agreed to give credit, provided it should be found too large.
B. R. Beverley's note is filed, bearing date the 29th of March, 1806, and binding himself to deliver bonds to the amount of 2500/. on or before the succeeding Chancery Court.
A copy of the judgment on the delivery bond, also filed, shews that the bond, after deducting an error, amounts te more than 2700/.
*107 The Chancellor perpetuated the injunction, on the ground, it is said, that the arrangement between Hunter’s administrators and General Lee, operated a discharge of Jett, the surety; and the counsel for the appellee, in this Court, has relied on that ground only, for sustaining the decree.
But a previous question presents itself: Is it competent to the appellee to insist on that ground, under the pleadings in this case?
I entirely concur with Judge Green as to the law in relation to the discharge of sureties, as laid down hy him in the case of Norris v. Crummey, 2 Rand. 328, that if a creditor, by agreement or any other act, precludes himself at law from proceeding against the principal, after the debt is due, even for a moment; or if the agreement be such as would induce a Court of Equity to prohibit the creditor from proceeding at law, the surety is discharged, and I also entirely concur with him, that the true ground or principle on which a surety is relieved in such cases, is, that the creditor, by his act or agreement, has injured the surety, by impairing his rights and remedies.
But this principle does not apply to a case, where the arrangement was made with the knowledge and assent of the surety; for, in such case, it cannot be said that the surety is injured. Volenti non fit injuria. It is not the mere circumstance of the creditor’s binding himself to give time to the principal, that will discharge, the surety. It is the binding himself to give such time, without the knowledge or assent of the surety; for, it is then only, that it is injurious to the surety. The surety, therefore, who seeks to discharge himself on the ground of time given to the principal, must state that which is essential to make it a discharge. He must state that the arrangement was made without his knowledge, or against his assent. This is the clear result of general principles, and is proved by the following, among other cases. Nesbit v. Smith, 2 Bro. Ch. Cas. 579. Rees v. Barrington, 2 Ves. jun. 540. Ex parte Smith, 3 Bro. Ch. Cas. 1. Samuel v. Hawarth, 3 Meriv. 272.
*108 Even where an arrangement has been made, tying up the pan()s 0f (-]le creditor, without the knowledge, or against the assent of the surety, it will not, of necessity, operate the discharge 0f fh0 SUrety, unless he choose to avail himself 0Jp The jaw w¡]] n0f force him to be discharged from his engagements against his will; and in a case where collateral security has been given, in consideration of the time extended, the surety who asks not to be discharged, but insists on the benefit of the collateral security, must be held to have assented to the arrangement originally, or to waive the discharge which he might have demanded.
Let us apply these principles to the case before us.
It does not appear from the case as stated in the bill, nor from any exhibit filed with the bill, that Hunter's administrators had bound themselves not to proceed on the judgment. The bill states, that Lee brought a letter from Tucker to the attorney, stating, that as the agent of Hunter’s administrators, he had made an arrangement which would suspend, for the present, all proceedings on the judgment and delivery' bond; and directing him to proceed no farther, until farther advised. But there is nothing in the letter, to shew that this suspension was obligatory. From any thing that appears in the letter, it may have been mere indulgence granted as a favor, and revocable at pleasure. Nor is that part of the bill which professes to state the arrangement, more satisfactory on this point. It says nothing about the suspension of the proceedings. All that it says about the arrangement, is, that P. R. Beverley undertook to settle the debt, provided Hunter’s administrators would receive bonds to the amount; without alleging that bonds to the amount had been given. There is no allegation in the bill, that the arrangement (even admitting it tied up the hands of Hunter’s administrators) was without the knowledge or against the consent of Jett, nor is there even a general allegation, that the arrangement was of a character to discharge Jett.
*109 So far from stating the facts necessary to constitute a discharge; so far from stating the arrangement to be of a character calculated to produce that effect; so far from asking to be discharged; Jett comes into Court, for the purpose (as appears from his bill) of insisting on the benefit of the counter-security under the arrangement, to enable him to pay the debt; thus clearly admitting, as I conceive, his liability to pay it.
Whether the arrangement was or was not of such a character as to discharge Jett, was not, therefore, a matter to which the administrators of Hunter were bound to answer; nor could it, under this bill, be a matter in issue between them. There was nothing in the bill to apprize them, that Jett sought to be discharged. They could not, therefore, be required either to deny, or disprove those facts, which might constitute a discharge. If he had chosen to put that matter in issue, Hunter’s administrators might have been prepared with full proof, to shew that he was not entitled to a discharge. To permit him to take them by surprize, and to rely upon it at the trial, would be contrary to justice and the established practice of Courts of Equity.
If it be said, that Jett’s calling upon Hunter’s administrators, by his bill, to disclose the arrangement alluded to in the letter, and to set forth the securities and money received, or to be received under it, is tantamount to an allegation on his part, that the arrangement was made without his knowledge or against his assent, I reply, that a man may be well supposed to be ignorant of the details of an arrangement, and yet be perfectly acquainted with its general character. Considering Jett’s situation, exposed to all the inconveniences of an execution on a delivery bond for so large an amount, he may be presumed to have anxiously desired some arrangement for time and counter-security; and it is evident, from his bill, that he knew that time had been given, although it is not stated whether it was given as mere indulgence, or otherwise. When, under these circumstances, he files his bill, asking information as to the *110 details of the arrangement, and praying the benefit of the payment and securities, which were the fruit of thearrangement, the bill, surely, contains in itself, no ground fot his (Jiggiiai-gg. Nor will the answer of Hunter's administrators aj<j fjjjjj ¡n this respect; for, the answer does not, any more than the bill, state facts which would entitle him to a discharge. In the first place, it denies that Lee complied with the terms of the arrangement; and the arrangement itself shews, that Hunter's administrators were not to be bound, (as will be more fully seen hereafter,) until the terms were complied with. The answer also is silent as to the important fact, whether the arrangement was made, with or without the knowledge or assent of Jett. And as Hunter's administrators had no reason to expect that Jett was seeking a discharge, their silence on this point cannot be the foundation of any inference unfavorable to them.
Even if Jett had been ignorant of the precise character of the arrangement, until he saw the answer, surely, if he then intended to shift his ground and go for a discharge, he should have insisted on it, and put it in issue, by an amended or supplemental bill.
I am therefore of opinion, on this ground, that the decree perpetuating the injunction is erroneous.
Even admitting the arrangement to have been made without the knowledge or against the consent of Jett., I do not consider it such as to discharge him, because, in fact, the hands of Hunter's administrators never were tied up. The proposition was, that Lee should deposit, as. collateral security, good Apgusta bonds, taken to P. It. Beverley; or Peter R. Beverley's noté, binding himself to make such deposit, to the amount of the debt. The Only stipulation as to time was, that in case Beverley's note should be given, he should bind himself to deliver the bonds by a day certain thereafter. As to the deposit to be made by Lee, viz: of bonds taken to P. E. Beverley, or of Beverley's own note to deliver such bonds, no time is mentioned. Lee enters into no obligation whatever to make such deposit. *111 It was a mere ‘‘proposition" on the part of Hunter's administrators, with which Lee might or might not comply, ás he should think proper. It would be preposterous to contend, that such a “proposition" imposed any obligation whatever on Hunter's administrators, until it was complied with by Lee. It is true that Lee might have delivered the bonds the next moment, and then they would have become bound to forbear. But, until such delivery, to the full amount of the debt, they were under no obligation whatever. The terms of the arrangement are express and positive on this point; the administrators agree, on their part, “ in'consideration of a punctual compliance by Gen. Lee, in delivering the bonds, &c. not to proceed, &e.” A compliance on the part of General Lee, with the terms of the proposition made by Hunter's administrators, was a condition precedent to any obligation on their part.
' Did General Lee comply with the terms of the arrangement, according to the evidence in this cause? He did not. Availing himself of the alternative afforded by the proposition of Hunter's administrators, instead of depositing “Augusta bonds taken to Peter R. Beverley," he chose to deposit Beverley’s note to make a deposit of such bonds. But the note of Beverley was for bonds to the amount of 25001. only; which was considerably less than the amount of the debt. As there was not, then, a compliance on the part of General Lee with the terms of the arrangement, the arrangement did not bind Hunter's administrators to suspend farther proceedings.
If the arrangement did not bind them, did the letter bind them ? The letter was no contract; and if it were, Lee was no party to it. It contained a mere direction to the counsel, for a temporary suspension of proceedings; but whether that suspension was granted as a favor, and liable to be revoked at pleasure, or not,_does not appear from the letter. Regarding the letter only, we cannot say that the suspension was the result of obligation incurred by Hunter’s administrators. Nor will the reference, in the *112 letter, to the “ arrangement,” go any farther to prove ob-x¡gation on their part. I have already shewn that the arrangement, not having been complied with by Lee, was never binding on them.
jf ¡t be said, that although Lee did not fully comply with the terms of the arrangement, yet Hunter's administrators accepted what he did, as full compliance; I answer that such acceptance is neither alleged in the bill, admitted by the answer, nor established by the proofs.
It is true that Lee went far towards complying with the arrangement; and that thereupon, Hunter's administrators suspended the proceedings. But, although this partial compliance was regarded by Hunter's administrators, as a motive sufficient to induce indulgence, it cannot be regarded by us as a legal consideration, sufficient to impose obligation. I therefore think the decree is erroneous on this ground also.
I am of opinion that the decree should be reversed, and the injunction dissolved, except for 1694Í. 10 8, with interest at the rate of 5 per cent, per annum, from March 29th, 1806, on 798i. 8, and with the like interest from March 31st, 1807, on 8961. 2 8; but that, as to the said sum of 1694/. 10 8, with the interest as aforesaid, there should be a reference to a commissioner, in order that Hunter's administrators may have the opportunity to shew, if they can, that that credit should be reduced, either as to principal or interest; and that the cause be remanded to be proceeded in, accordingly, to a final decree.
Judge Carr and the President concurred, and a decree was entered according to the foregoing principles.*